IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 2:13cr40 |
| | ) | |
| v. | ) | |
| | ) | |
| DIANA SHIPPING SERVICES S.A., | ) | |
| | ) | |
| IOANNIS PROKAKIS, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANTONIOS BOUMPOUTELOS, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## TRIAL MEMORANDUM OF THE UNITED STATES

COMES NOW, the United States of America by its undersigned attorneys and files this Trial Memorandum, in lieu of an opening statement, to apprise the district court of matters of law and of fact that the government anticipates may become an issue during the course of the trial.

### A. SUMMARY OF THE CASE

**Coast Guard Inspection**

The United States believes that the testimony and exhibits offered at the trial will establish the following facts in sum and substance.

On September 22, 2012, Coast Guard inspectors from Sector Hampton Roads boarded the Motor Vessel ("M/V") Thetis in Norfolk, Virginia. The vessel was operated by defendant Diana Shipping Services S.A., defendant Ioannis Prokakis served as the Chief Engineer, and defendant Antonios Boumpoutelos served as the Second Assistant Engineer. Prior to the boarding, Coast Guard inspectors had received a report from an engine room crewmember claiming that bilge water and sludge had been discharged from the vessel illegally. Once onboard, the inspectors

spoke with the engineering crewmembers and located all of the pieces of piping that made up the two separate "magic pipes" that were allegedly used to discharge bilge water and sludge directly into the sea. The Oiler, Wiper, Cadet, Junior Engineer and Third Assistant Engineer all confirmed that on every voyage they were ordered by the Chief Engineer and the Second Assistant Engineer to install the "magic pipe" to discharge the engineroom bilge water holding tank and to use the installed ballast stripping pump to discharge the engineroom bilges directly into the sea. The crew confirmed that the "magic pipe" used to discharge the sludge tank was used from October 2011 until April 2012.

During the boarding, the Coast Guard inspectors directed Prokakis and Boumpoutelso to demonstrate the proper operation of the vessel's Oil Water Separator ("OWS"). Despite numerous attempts over several hours, neither could demonstrate proper operation. During one of the attempts, Boumpoutelos tried to convince a Coast Guard Inspector that it was operating properly when it was not. The Coast Guard inspector could plainly observe that the pump for the OWS was not taking suction from the bilge tank. The inspector then asked Boumpoutelos to prove operation of the vessel's bilge pump, and he was unable to do so. Both the OWS and the bilge pump were inoperable during the Coast Guard inspection which spanned several days.

Early in the inspection, a Coast Guard inspector asked the Third Assistant Engineer for the vessel's tank sounding log while they were together in the Engine Control Room. Soundings (measurement of volume) of various waste tanks are often performed daily and recorded in a sounding log. The Coast Guard inspector retrieved the Sounding Log from the Engine Control Room. There were other crewmembers in the Engine Control Room, including Boumpoutelos. The inspector then proceeded to the Master's office to show his fellow inspector the Sounding

Log. When Prokakis, who was already in the Master's office, saw the Sounding Log, he tried to snatch it from the inspector's hands.

The primary inspection of the vessel spanned two days. The inspectors, with the assistance of Coast Guard Criminal Investigation special agents, interviewed all of the engineering crewmembers. Prokakis and Boumpoutelos denied that they knew about or ordered the use of the "magic pipes." Prior to being interviewed by Coast Guard personnel, defendant Prokakis instructed the junior engineering crewmembers to deny any knowledge about the "magic pipes." With the exception of the Oiler and Wiper, the other junior engineering crewmembers obeyed this order and denied knowledge of the "magic pipes." However, in subsequent interviews, all of the junior engineering crew, with the exception of the fitter, confirmed that they were regularly ordered to install and use the "magic pipe" for discharging the bilge water holding tank. The "magic pipe" that was used to discharge sludge was used up until May 2012. They also stated that prior to entry into the United States, the "magic pipes" would be disassembled and hidden in various parts of the engineroom, including on the roof of the Engine Control Room.

After defendant Prokakis saw that the Coast Guard inspector had possession of the Sound Log, he confronted the Third Assistant Engineer. Prokakis accused the Third Assistant Engineer of giving the Sounding Log to the Coast Guard inspector and threatened to kill him.

**Methods of Discharge**

There were two methods of discharging engineroom bilge water and one method of discharging sludge. Engineroom bilge water was discharged directly from the bilges and overboard using the vessel's installed emergency eductor system. This was a rather simple process of turning on the vessel's general services pump and then opening valves for the various

bilge wells located throughout the engineroom. This system is designed to be used only in an emergency to discharge the engineroom bilges. The junior engineering crew stated they were ordered to use this system on every voyage the vessel took. The junior engineering crew never witnessed the OWS being used to properly process and discharge engineroom bilge water.

The second method used to discharge engineroom bilge water from the bilge holding tank was by connecting a pipe between the OWS intake piping and the emergency bilge discharge piping. When the general services pump was energized, this would create a suction through the "magic pipe" and draw out of the contents of the bilge holding tank and discharge it directly into the sea. The Coast Guard inspectors directed the junior engineering crew to install the piping and it connected perfectly. There are no entries in the vessel's Oil Record Book documenting the use of this method of discharge.

The third method of discharge involved the vessel's sludge tank. The "magic pipe" was installed between the discharge side of the sludge pump and the boiler blow down valve. The sludge pump would then be energized and cause the sludge to be discharged through the boiler blow down valve and directly into the sea. The boiler blow down valve is normally connected to the boiler blow down and hot water and alkalis from the boiler are periodically discharged directly into the sea. This is a normal and legal operation. There are no hydrocarbons in the water that is typically blown out of the boiler. However, samples from the boiler blow down on the M/V Thetis confirmed the presence of hydrocarbons, which corroborates that the "magic pipe" was used to discharge hydrocarbons through the boiler blow down valve. There are no entries in the vessel's Oil Record Book documenting the use of this method of discharge.

**Port Calls**

During the timeframe that the current crewmember witnesses were onboard, ranging from October 2011 to September 2012, the vessel made five port calls into the United States. Prior to each port call there were illegal discharges, false entries (claiming use of the OWS when it was not used) made in the Oil Record Book, and the "magic pipes" were hidden prior to entering United States waters. Entries were never made documenting the methods of discharge discussed *supra*. Therefore, there will be testimonial evidence regarding the falsity of the Oil Record Book for the following port calls:

> March 26, 2012 - Gramercy, Louisiana
> May 2, 2012 - Newport News, Virginia
> June 5, 2012 - Gramercy, Louisiana
> July 8, 2012 - Newport News, Virginia
> September 22, 2012 - Norfolk, Virginia

**B. POTENTIAL LEGAL/EVIDENTIARY ISSUES DURING TRIAL**

Ship's Records

In this case, the government will present a number of documents that fall within the business records exception, including various ship records in which data concerning the ship's movements, condition, and operations were recorded on a regular basis by the ship's equipment or crew members; manuals, instructions, and guides prepared by the company as reference materials relied upon by crew members in operating the ship; printouts from shipboard computer systems that monitored the ship's operations; documents maintained on the ship as proof of identity, inspection, and certification; and documents created and maintained as part of the personnel files of the ship's crew members. These are all documents generated, maintained, and relied on by defendant Diana Shipping Services S.A. in its normal course of business.

Rule 803(6) of the Federal Rules of Evidence makes an exception to the general rule that hearsay is inadmissible for "[r]ecords of regularly conducted activity." This is generally referred to as the "business records exception" to the hearsay rule. *See United States v. Laguerre*, 146 Fed.Appx. 595, 597 (4th Cir. 2005) ("Rule 803(6) is an exception to the hearsay rule for business records that permits their introduction as long as they satisfy certain requirements; Rule 803(6) references Rule 902(11), which permits authentication of these records by certification of the custodian or other qualified person, and thus eliminates the need for foundation testimony at trial."); *Brown v. Town of Chapel Hill, N.C.*, 1996 WL 119932, 2 (4th Cir. 1996) (Rule 803(6) provides that certain records kept in the ordinary course of business are admissible as an exception to the hearsay rule; the nature of the records may be established by a "qualified witness," who has sufficient knowledge of the record-keeping system and the creation of the contested record to establish their trustworthiness."). The district court has great latitude on the issue of trustworthiness, and a district court may properly admit any record relied upon by companies in the course of their business upon proper authentication by the custodian. *United States v. Duncan*, 919 F.2d 981, 987 (5th Cir. 1990); *United States v. Hutson*, 821 F.2d 1015, 1020 (5th Cir. 1987).

<u>Charts, Maps, Summaries</u>

The government may seek to present summaries and charts to summarize the data found in the voluminous ship records and logs involved in this case. For example, the government anticipates seeking to present a time line and other summary charts showing the when certain crewmembers were onboard the vessel during the time span of the conspiracy. In addition, the government will seek to present a summation that compares the data from the vessel's Oil Record Book and the Sounding Log. Any such exhibits will be based on data from the logs of

the ship. Such summaries, charts, and maps would be useful to the Court's understanding of the case and is the type of exhibit the Court has the discretion to allow under Rule 611(a). *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) (Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) to facilitate the presentation and comprehension of evidence already in the record; these "pedagogical" devices are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted).

Federal Rule of Evidence 1006 provides: "The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Summaries and charts that meet the requirements of Rule 1006 are admissible as evidence themselves. *See United States v. Pineda*, 1996 WL 379799, 3 (4th Cir. 1996) (Rule 1006 states the contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation). Other charts and summaries may be used as "pedagogical devices" to present the United States' case within the trial court's discretion under Rule 611(a). *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004).

<u>Interpreters</u>

Five of the government's witnesses speak Tagalog as their first language. Many are able to speak and understand English to varying degrees. In order to ensure proper communication, the government will provide a Tagalog interpreter. In addition, as the Court is aware, defendants Prokakis and Boumpoutelos speak Greek as their first language thus a Greek interpreter would be needed as well.

"Magic Pipes"

The government will also seek to admit into evidence the actual physical "magic pipes" themselves. There are three sections of pipe ranging from approximately four to ten feet in length. The ends of the pipes are wrapped in evidence bags and sealed with evidence tape to prevent the oil in the pipes from leaking out. These pipes are very important pieces of evidence for the Court to consider. The government will try and prepare an apparatus or staging system to allow for the pipes to be displayed properly and safely in court.

                              Respectfully submitted,

                              NEIL H. MACBRIDE
                              UNITED STATES ATTORNEY

By:       _____/s/_____
        Joseph L. Kosky
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        101 West Main Street, Suite 8000
        Norfolk, Virginia 23510
        Office Number (757) 441-6331
        Facsimile Number (757) 441-3205
        E-Mail Address - joseph.kosky@usdoj.gov

        ROBERT G. DREHER
        ACTING ASSISTANT ATTORNEY GENERAL
        Environment and Natural Resources Division
        United States Department of Justice

By:      _____/s/_____
        Kenneth E. Nelson
        Trial Attorney
        Environmental Crimes Section
        United States Department of Justice
        601 D. Street, NW, Suite 2814
        Washington, DC 20004
        Office Number (202) 305-0435
        Facsimile Number (202) 514-8865
        E-Mail Address – kenneth.nelson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Michael G. Chalos, Esquire
Chalos O'Connor, LLP
366 Main Street
Port Washington, New York 11050
mchalos@codus-law.com

Trey R. Kelleter, Esquire
Vandeventer Black, LLP
500 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
tkelleter@vanblk.com

Carl Woodward, Esquire
Carella, Byrne, Cecchi, Olsen, Brody, & Agnello, P.A.
5 Becker Farm Road
Roseland, New Jersey 07068
cwoodward@carellabyrne.com

Lawrence Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
4525 South Boulevard, Suite 300
Virginia Beach, Virginia 23452
lwoodward@srgslaw.com

Michael K. Twersky, Esquire
Fox Rothschild, LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
mtwersky@foxrothschild.com

Patrick H. O'Donnell, Esquire
Kaufman & Canoles
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
phodonnell@kaufcan.com

                                                    _____/s/_____
Joseph L. Kosky
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-3205
E-Mail Address - joseph.kosky@usdoj.gov

10