**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**NORFOLK DIVISION**

UNITED STATES OF AMERICA

     v.         Crim. No. 2:13-cr-40

DIANA SHIPPING SERVICES S.A.,
IOANNIS PROKAKIS and
ANTONIOS BOUMPOUTELOS

**DEFENDANT DIANA SHIPPING SERVICES S.A.'S MEMORANDUM
IN AID OF SENTENCING**

COMES NOW Defendant, Diana Shipping Services S.A., (hereinafter "DSS"), by its undersigned counsel, and files this Memorandum in Aid of Sentencing.

**PRELIMINARY STATEMENT**

On August 8, 2013, the Court found DSS guilty of eleven (11) counts of violating 18 U.S.C. § 371, 33 U.S.C. § 1908(a), 18 U.S.C. § 1519 and 18 U.S.C. § 1505. The Court held DSS vicariously liable for the illegal acts of its employees Defendants Ioannis Prokakis and Antonios Boumpoutelos, which occurred onboard the M/V THETIS.  For the reasons set forth below, DSS respectfully requests the Court, pursuant to the applicable provisions of 18 U.S.C. § 3553 and 18 U.S.C. § 3572, sentence DSS to pay a total fine of no more than $400,000, serve a three (3) year term of probation and continue to operate pursuant to its existing comprehensive Enhanced Environmental Management System ("EEMS"), under the supervision of a Jointly Nominated, Court approved Court Appointed Monitor ("CAM").

I.      **Determining the Appropriate Sentence for Organizational Defendants**

In determining an appropriate sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553 and 18 U.S.C. § 3572. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). In this regard, the Court's "overarching" duty is to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *see also Pepper*, 131 S. Ct. at 1242-43.

This Court found DSS guilty of violating 18 U.S.C. §371 (Count One), three counts of violating 33 U.S.C. §1908(a) (Counts Two, Three and Four), six counts of violating 18 U.S.C. §1519 (Counts Five through Ten) and one count of violating 18 U.S.C. §1505 (Count Eleven).[1] Pursuant to the Statutory Index contained in U.S. SENTENCING GUIDELINES MANUAL App. A, the applicable guideline for a violation of 18 U.S.C. §371 is U.S.S.G. § 2X1.1. That section provides a cross-reference to the guideline section for the offense that is the object of the conspiracy. The objects of the conspiracy charged in Count One of the Superseding Indictment are 33 U.S.C. §1908 and 18 U.S.C. §1519.[2] The relevant guideline section for violations of 33 U.S.C. §1908 is U.S.S.G. § 2Q1.3 and the relevant guideline section for violations of 18 U.S.C. §1519 is U.S.S.G. § 2J1.2. DSS was also convicted of 18 U.S.C. §1505,[3] and the relevant guideline section for this statute is U.S.S.G. § 2J1.2.

U.S.S.G. Chapter Eight applies to the sentencing of all organizations convicted of felony offenses. *See* U.S.S.G. § 8A1.1. With respect to a determination of a fine, U.S.S.G. §

---

[1] DSS was found criminally liable for the acts of its employees on the basis of vicarious liability. There was no testimony or evidence presented at trial to infer DSS directed or condoned the conduct engaged in by the vessel's Chief Engineer Prokakis or Second Engineer Boumpoutelos.

[2] *See* Docket Entry No. 30, Superseding Indictment, at pp. 8 – 12.

[3] Count Eleven of the Superseding Indictment (charging that Defendant Prokakis instructed members of the vessel's crew to lie to the Coast Guard in the course of the on board investigation). Again, there was no evidence adduced at trial that DSS ever knew of or condoned this spontaneous and self-serving instruction to the crew by Defendant Prokakis. *See* Docket Entry No. 30, at p. 20.

8A1.2(b)(2) provides that U.S.S.G. § 8C2.1 is to be applied to identify the counts for which provisions U.S.S.G. §§ 8C2.2 through 8C2.9 apply. The rules for calculating the fine range in §§8C2.2 through 8C2.9 are limited to specifically enumerated offenses listed in U.S.S.G. §8C2.1. However, neither U.S.S.G. §2Q1.3, nor U.S.S.G. § 2J1.2, are covered under U.S.S.G. § 8C2.1. For those counts which the applicable guideline is not enumerated in U.S.S.G. §8C2.1, the provisions of U.S.S.G. § 8C2.10 are to be applied in the determination of the fine amount. That guideline section provides that the Court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572 and the various factors contained therein. Accordingly, discussed below are the relevant factors set forth in those sections that the Court is required to consider in determining an appropriate and reasonable sentence for DSS.

## II.      Analysis of 18 U.S.C. § 3553 Factors

In accordance with 18 U.S.C. §3553(a), the Court is directed to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The statute requires the Court to ensure a sentence satisfies the enumerated statutory objectives, but to also ensure that any sentence imposed is the *minimum* sentence necessary to meet those objectives. (emphasis added).

### A.      Nature and Circumstances of the Offenses

Since its incorporation in 1986, DSS has placed particular emphasis on complying with environmental laws and has required that all vessels under its technical management be operated

in a manner designed to protect and preserve the marine environment.[4] The impact and result of this policy is borne out by the fact that since 2009, vessels under the technical management of DSS have called the United States on 154 separate occasions, and those vessels were subject to 53 Port State Control Inspections conducted by the United States Coast Guard.[5] The only inspection that resulted in a vessel detention and commencement of a criminal prosecution for violations of U.S. environmental laws was the inspection of the M/V THETIS on September 22, 2012. Based on DSS's extensive and exemplary track record of compliance during U.S. port calls, it is respectfully submitted that the incident in question was an isolated and anomalous occurrence.[6]

### 1. DSS Was Not Convicted of Any Pollution Offenses

The counts for which guilty verdicts were returned against DSS involve four separate statutes. With the exception of Count Eleven[7], the gravamen of all of the counts is the failure to maintain an accurate Oil Record Book, the presentation of the Oil Record Book to Coast Guard

---

[4] DSS Director, Mr. Zafirakis, testified at trial that DSS has focused on environmental compliance as part of its long term strategy to succeed in today's shipping market. In this regard, DSS's commercial reputation as a first class operator of ocean going bulk carrier vessels can only be maintained by ensuring that each one of the thirty-six modern vessels under its management are fully compliant with all applicable maritime environmental regulations.

[5] Over this nearly five year period, on average, a vessel under the technical management of DSS has called the United States approximately once every eleven days.

[6] In order to ensure this incident will never again occur in the future, DSS has spent over $330,000 to revise its existing Management System and implement an Enhanced Environmental Management System (EEMS). This amount includes the costs incurred to train all crewmembers and shoreside employees in respect to the provisions of the revised EEMS, the amounts paid to have the vessels under DSS's management audited to ensure they are fully compliant with the provisions of the EEMS and all maritime environmental laws and regulations, and costs for a series of modifications to the vessels' engine room equipment and appurtenances, including, but not limited to, implementation of an environmental tag system, to prevent the unauthorized discharge of bilge waste from the vessels under its management.

[7] As more fully discussed below, DSS respectfully submits that the actions of Mr. Prokakis, which form the factual and legal basis for this count of conviction, were taken for purely personal, self-serving reasons (i.e., an attempt to avoid being arrested and prosecuted for violations of the APPS and other applicable U.S. laws). It is respectfully submitted that Mr. Prokakis' attempts at self-preservation as demonstrated through his conduct and as alleged in this particular count, should not be considered in the determination of the appropriate sentence for DSS.

personnel during a Coast Guard Port State Control examination and concealment of the so-called "bypass pipes" while the M/V THETIS was in U.S. waters.[8]

In this regard, the objects of the conspiracy charged in Count One are identical to the substantive counts charged in Counts Two through Ten of the Superseding Indictment. Specifically, Counts Two, Three and Four involve violations of the APPS, as the Court found the Chief Engineer and Second Engineer of the M/V THETIS failed to maintain an accurate Oil Record Book, while Counts Five, Six and Seven related to the Chief Engineer and Second Engineer making false or omitted entries in the vessel's Oil Record Book to impede Coast Guard inspectors.[9]   In Counts Eight, Nine and Ten, the Court found that the individual Defendants unlawfully ordered the concealment of the bypass pipes to avoid their discovery during the course of a Coast Guard Port State Control examination. Each of these counts corresponded with the M/V THETIS calling at ports within the Eastern District of Virginia on three separate occasions: May 2, 2012 (Counts Two, Five and Eight); July 8, 2012 (Counts Three, Six and Nine); and, September 22, 2012 (Counts Four, Seven and Ten). None of these Counts related to the discharge of bilge wastes into U.S. waters, or any other act resulting in the pollution of the maritime environment of the United States.

With respect to Count Eleven, defendant Prokakis was convicted of instructing junior engineering crewmembers to deny to the U.S. Coast Guard inspectors that they had any

---

[8] Again, the basis for DSS's conviction on all counts is vicarious liability for the actions of the individual defendant crewmembers. The Court expressly found that there was no testimony or evidence presented at trial to suggest DSS ever engaged in any direct criminal conduct. *See* Exhibit A, Verdict Transcript, dated August 8, 2013, at p. 19 ("I do not find direct criminal liability on the part of Diana Shipping Services."). Furthermore, every crewmember who testified at trial stated that they never notified DSS of the conduct that occurred on the vessel, despite the fact that they had available to them and knew the contact details of DSS management and numerous opportunities to do so.

[9] The APPS does not apply extraterritorially to foreign flag vessels. *See United States v. Sanford Ltd.*, 880 F. Supp. 2d 9, 14 (D.D.C. 2012)(citing *Pasquantino v. United States*, 544 U.S. 349, 373 (2005)); *see also United States v. Abrogar*, 459 F.3d 430, 435-36 (3d Cir. 2006)(holding that relevant conduct for purposes of sentencing in an APPS related actions is strictly limited to conduct that occurs while the vessel was in U.S. waters).

knowledge of the bypass piping. Although DSS was held vicariously liable for this charge, it is respectfully submitted that for purposes of sentencing, the Court must consider the specific acts of defendant Prokakis relating to this count and examine his specific intent when engaging in the acts for which he was convicted.  The testimony at trial demonstrated that defendant Prokakis did not instruct these junior crewmembers to lie to Coast Guard inspectors in order to benefit DSS, but instead acted in a desperate attempt to avoid personal liability and prosecution in the event the Coast Guard discovered his prior acts.

At that moment, Prokakis was not concerned with his employer's well-being, but was instead seeking to benefit himself only by convincing junior crewmembers not to implicate him in criminal activity. While DSS may be vicariously responsible for the acts of its employees undertaken in the course of their employment for the intended benefit of the employer, a distinction must be recognized and applied by the Court at sentencing for those acts of the employees that were never intended to benefit the employer.[10] Accordingly, it is respectfully submitted that for purposes of sentencing, these acts, which formed the basis for Count Eleven, should be attributed solely to Prokakis, and not his former employer, DSS.

With regards to the underlying conduct charged in Counts Two, Three and Four (the APPS counts), the testimony at trial from multiple government witnesses was that certain engine

---

[10] In this regard, commentators have urged that when determining the level of culpability and appropriate sentence for a corporation held vicariously liable for the actions of its employees, courts should consider the underlying actions of the employees, their intent in committing the acts and the actual benefit, if any, received by the corporation as a result of these actions. *See* Richard S. Gruner, TOWARDS AN ORGANIZATIONAL JURISPRUDENCE: TRANSFORMING CORPORATE CRIMINAL LAW THROUGH FEDERAL SENTENCING REFORM, 36 Ariz. L. Rev. 407, 462 (1994).  Specifically, the "blameworthiness of a firm in initiating or promoting offenses" must be considered when determining the fine that should be imposed on the corporation. *See id.* This is the case, as it is fundamentally unfair "to treat all employee actions as equally attributable to corporate defendants regardless of" the fact that the actions resulted in little or no benefit to the corporation, and violated the corporation's policies and procedures that prohibited these types of actions.

room operations and discharges occurred while the M/V THETIS was on the high seas. There was no evidence or testimony presented at trial that any illegal discharges of bilge wastes occurred while the vessel was in U.S. waters.  Because the M/V THETIS is a Bahamian flagged vessel, the laws of the Bahamas, as the flag state, apply to acts occurring on the high seas.[11]  The United States has neither the authority nor the jurisdiction to prosecute a foreign flagged vessel for improper discharges of bilge waste that may have occurred on the high seas.[12]  Furthermore, any such acts cannot be considered relevant conduct for determining an appropriate sentence, as the counts of conviction relate to the conduct that occurred while the M/V THETIS was present in U.S. waters.[13]  In this regard, none of the elements of the offenses for which DSS was convicted related to discharges of bilge wastes in U.S. waters.  Instead, the charges relate to record keeping offenses and actions that occurred during the vessel's calls at ports within the Eastern District of Virginia.

The Third Circuit Court of Appeals in *United States v. Abrogar*, 459 F.3d 430, 435-36 (3d Cir. 2006), has held that improper bilge waste discharges which occurred aboard a foreign flagged vessel on the high seas are not "relevant conduct" for the purposes of determining the appropriate sentence in APPS related prosecutions. *See id.* at 436.  DSS acknowledges that while evidence of such extraterritorial discharges was found to be relevant at trial, the offenses for

---

[11] *See United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009) ("There are two pertinent limitations to the application of the APPS. First, [APPS] appl[ies] to U.S.-registered ships wherever they are (including beyond U.S. waters), but to any foreign-flagged ships only "while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States" …. Second, the APPS states that "[a]ny action taken under [the APPS] shall be taken in accordance with international law."); *see also* 33 U.S.C. § 1912; 33 C.F.R. § 151.09(a)(1)-(5); 33 U.S.C. § 1902(a)(2).

[12] "We conclude, therefore, that under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters.  Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port." *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006).

[13] *See id.*

which DSS stands convicted are limited to domestic recordkeeping offenses and conduct related to the Coast Guard's Port State Control inspection of the vessel on September 22, 2012. Accordingly, those actions are the relevant conduct that must be considered by the Court, along with the factors discussed below, when determining the appropriate sentence in this matter.

With regards to Counts Five through Ten, DSS previously filed a Rule 29 motion seeking a judgment of acquittal as to these four counts,[14] on the basis that the evidence presented by the government at trial clearly established that Counts Five, Six, Eight and Nine of the Superseding Indictment are multiplicitous. That is, the conduct charged in these counts constitutes the very same conduct charged in Counts Seven and Ten of the Superseding Indictment. DSS argued in the motion that, based on the evidence presented by the government at trial, it was obvious that it impermissibly split one single charged violation of 18 U.S.C. § 1519 in the Superseding Indictment (for the falsification of the vessel's oil record book) into three separate counts.[15] Similarly, a single alleged violation of 18 U.S.C. § 1519 for the concealment of the "bypass piping" was charged as three separate offenses.[16]

Accordingly, DSS moved for a judgment of acquittal on these Counts as the government is improperly attempting to hold the Defendants criminally liable for multiple and successive violations 18 U.S.C. § 1519 based on the <u>same exact conduct</u> charged in Counts Seven and Ten

---

[14] *See* Docket Entry No. 112 (filed jointly with the individual Defendants).

[15] It is undisputed that when the M/V THETIS called ports within the Eastern District of Virginia on May 2, 2012 and July 8, 2012, there was absolutely no interaction between the vessel's crew and the United States Coast Guard or any other U.S. government agent. The sole interaction between the Coast Guard and the crewmembers of the M/V THETIS occurred during the Port State Control inspection that began on September 22, 2012. Most importantly, the sole presentment of the vessel's allegedly false oil record book, which is the *actus reus* that forms the basis of Counts Five, Six and Seven, occurred only on September 22, 2012.

[16] Similarly, the government asserted in Counts Eight, Nine and Ten, that the vessel's crewmembers concealed the so-called "bypass pipe" in order to prevent the Coast Guard from discovering said piping during the course of a Port State Control inspection. The evidence presented at trial clearly established that no Port State Control inspections were conducted by the Coast Guard during the May 2, 2012 and July 8, 2012 port calls. Accordingly, the *actus reus* for each of these counts is the obstruction that occurred during the September 22, 2012 Port State Control inspection, not the two previous port calls within the District.

of the Superseding Indictment.  Even if the pending motion is denied, for purposes of sentencing, the principles enunciated in the motion cannot be ignored. In this regard, the conduct alleged in Counts Five and Six, but for the date of the individual port calls, is identical to the conduct charged in Count Seven, and the evidence presented at trial in respect to these counts was virtually indistinguishable. Likewise, for Counts Eight and Nine are identical in their language to Count Ten, but for the date of the port calls, and the evidence presented at trial to sustain the convictions was the same evidence relied on by the government to support the Count Ten allegations.

While DSS respects the Court's findings as to these counts, it is undisputed that there was no actual obstruction of any government investigation during the M/V THETIS's May 2, 2012 and July 8, 2012 U.S. port calls, nor could there be any, as there was absolutely no contact between the vessel's crewmembers and the United States Coast Guard on those dates. Accordingly, for purposes of sentencing, DSS respectfully submits that the complete lack of any evidence of any obstruction of an actual Coast Guard investigation must be considered as a critical mitigating factor in determining the sentence to be imposed.

### 2.    DSS Was Convicted On The Basis of Vicarious Liability

DSS was charged and convicted vicariously for the acts of its former employees, specifically former Chief Engineer Prokakis and former Second Engineer Boumpoutelos.[17] There was no testimony offered at trial to establish or even imply that DSS had any direct knowledge, involvement or provided any instruction to any of its crewmembers to engage in the

---

[17] In this Circuit "a corporation is liable for the criminal acts of its employees and agents done within the scope of their employment with the intent to benefit the corporation." *Mylan Lab., Inc. v. Akzo, N.V.*, 2 F.3d 56, 63 (4th Cir. 1993). The appropriate "scope of employment" of such an employee or agent has been defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated -- at least in part -- by an intent to benefit the corporate employer. *See United States v. Automated Med. Labs.*, 770 F.2d 399, 406-07 (4th Cir. 1985).

conduct giving rise to the convictions. In this regard, the Court expressly held, when announcing its verdict that, "I do not find direct criminal liability on the part of Diana Shipping Services.  I find it based upon the vicarious liability of the other two defendants. . ." *See* Exhibit A, Verdict Transcript, at p. 19.

The absence of any direct criminal conduct by DSS, and the fact that DSS is a lawfully organized corporation that has never been previously convicted or charged with any criminal offense, are critical mitigating factors that must be considered by the Court when imposing a sentence.[18] The sentence to be imposed on a legitimate, heretofore law abiding, corporate defendant held vicariously liable for the unauthorized acts of its employees must necessarily be substantially lower than the sentence imposed on corporations that directly engage in criminal conduct (i.e., Criminal Purpose Organizations), [19] or that are multiple convicted offenders.[20]

---

[18] As DSS has never previously been charged or convicted of any criminal offense, it is a "first time offender," which is an important mitigating factor in the determination of an appropriate sentence. *See United States v. Sheffer*, 896 F.2d 842, 845 (4th Cir. 1990) (approving the District Court's taking into account the defendant's status as a "first time offender" in imposing a less severe sentence).

19 The Sentencing Guidelines state that in a "case in which the court, based upon an examination of the nature and circumstances of the offense and the history and characteristics of the organization, determines that the organization was operated primarily for a criminal purpose (e.g., a front for a scheme that was designed to commit fraud; an organization established to participate in the illegal manufacture, importation, or distribution of a controlled substance) or operated primarily by criminal means (e.g., a hazardous waste disposal business that had no legitimate means of disposing of hazardous waste). In such a case, the fine shall be set at an amount sufficient to remove all of the organization's net assets. If the extent of the assets of the organization is unknown, the maximum fine authorized by statute should be imposed, absent innocent bona fide creditors." U.S.S.G. §8C1.1.  As DSS is a lawfully formed corporation, with a proven record of environmental compliance when calling at US ports and no prior criminal history of illegal activities, any sentence imposed should reflect the defendant corporation's heretofore law abiding activities and on-going commitment to environmental compliance.

[20] In *United States v. Ionia Management S.A.*, 537 F.Supp. 324, 325 (D.Conn. 2008), the organizational defendant was charged and convicted of eighteen (18) counts, including violations of 33 U.S.C. § 1908, 18 U.S.C. § 371, 18 U.S.C. § 1519 and 18 U.S.C. § 1505, the same charges brought in this action. Despite the fact that the organizational defendant had previously been convicted of an APPS related offense, the district court refused the government's invitation to impose the maximum statutory fine of $9,000,000. Instead, the Court imposed a $4,900,000 fine, which the Court indicated was substantially higher than the fine it would have imposed on a first time offender, because the underlying conduct giving rise to the convictions occurred while Ionia was serving a term of probation from its earlier conviction. The court also used a modified "grouping" analysis to arrive at the fine amount taking into account the second time offender status of the defendant.

## B.    History and Characteristics of the Defendant

DSS was formed in 1986 pursuant to the laws of the Republic of Panama.  Since 1986, DSS has acted as the technical manager of ocean going commercial vessels.[21] DSS currently manages and operates a fleet of thirty-six (36) dry cargo ocean-going vessels, for its publicly traded parent company, Diana Shipping Inc.[22]

As stated above, the vessels managed by DSS have regularly called at ports in the United States in the past and continue to do so today, without incident, but for this action. This case is the first instance that DSS has been involved in any type of criminal prosecution in its history. It is respectfully submitted that based on this track record of compliance and lawful operations, the acts of the individual Defendants constituted an isolated and anomalous incident.

### 1.    DSS Has Voluntarily Implemented An Effective  Environmental Compliance Program Following The Detention Of The M/V THETIS

DSS, as a responsible corporate citizen, utilized the M/V THETIS incident, before the conviction in this matter,  as "a lesson learned" and has accordingly  revised, strengthened and improved its existing Management System to ensure that it operates its vessels with a state of the art environmental compliance program, with enhanced training and oversight supervision of its employees in respect to all of the requirements contained therein, as well as ensured that all vessel pollution control equipment and devices are functioning properly and that its managed vessels are equipped with redundant spares parts.

---

[21] A technical manager is responsible for the technical operation of oceangoing commercial vessels.  Technical managers provide services that maximize the operational efficiency and physical condition of vessels under their management, to ensure compliance with applicable maritime laws and regulations, including all international and U.S. marine environmental laws and regulations.

[22] Diana Shipping Inc. is a global provider of shipping transportation services, specializing in the ownership of dry bulk vessels. It is publicly traded on the New York Stock Exchange (NYSE) under symbol DSX. Currently, all dry bulk vessels owned by wholly-owned subsidiaries of Diana Shipping Inc. are technically managed by DSS.

Following the detention of the M/V THETIS in September 2012, DSS immediately thereafter undertook a comprehensive review of its existing Management Systems, including its environmental compliance policies and procedures, which resulted in the revision and implementation of an Enhanced Environmental Management System (EEMS). In this regard, in October 2012, a special Management Review meeting was conducted by the top management of DSS.  As a result, DSS management undertook the task of enhancing its existing Environmental Management System to make certain its operations, both shoreside and onboard the vessels it operated, would be in complete compliance with all applicable U.S. and international pollution prevention laws and regulations, and would incorporate cutting-edge industry best practices to ensure environmental compliance. In this regard, DSS has revised and implemented an EEMS that provides a comprehensive, encompassing and rigorous program.[23]

Beyond merely revising and putting the EEMS into practice, DSS proactively chose to have its entire shoreside and vessel operations audited and inspected by an independent auditor to determine whether DSS could be certified as International Standard Organization ("ISO")[24] 14001 compliant. ISO 14001 is a voluntary environmental standard[25], developed by the ISO to

---

[23] The relevant sections of the EEMS are discussed in more detail below in Section VII. The EEMS will be made available to the Court at the December 5, 2013 sentencing hearing. Copies of the EEMS will be provided to the Department of Justice with the filing of this memorandum.

[24] Founded in 1946, when delegates from twenty-five (25) countries met at the Institute of Civil Engineers in London and decided to create a new international organization 'to facilitate the international coordination and unification of industrial standards'. In February 1947 the new organization, ISO, officially began operations. Since then, ISO has published over 19,500 International Standards covering almost all aspects of technology and manufacturing. As of 2013, ISO has members from 164 countries and 3,368 technical bodies to take care of standard development. *See* http://www.iso.org/iso/home/about.htm (last visited November 29, 2013).

[25] ISO 14000 is not merely a single standard, but rather a "family of standards" related to corporate environmental management and compliance that helps organizations "(a) minimize how their operations (processes etc.) negatively affect the environment (i.e. cause adverse changes to air, water, or land); (b) comply with applicable laws, regulations, and other environmentally oriented requirements, and (c) continually improve in the above." *See* http://www.iso.org/iso/home/standards/management-standards/iso14000.htm. (last visited November 29, 2013). The requirements of ISO 14001 are an integral part of the European Union's Eco-Management and Audit Scheme (EMAS).  According to the ISO, EMS's structure and material requirements are more demanding in respect to performance improvement, legal compliance and reporting duties than non-certified systems.  Specifically, ISO

12

prescribe a framework for corporations and other organizations to achieve effective environmental management and compliance through the development and implementation of an environmental management system.

With regards to DSS, the ISO 14001 standard provided the framework to develop an environmental policy, establish objectives and processes to achieve the policy commitments, and take action as needed to improve its performance. Unlike some other voluntary environmental programs, the ISO 14001 requires its participants to receive an initial certification audit, conducted by certified external, independent auditors who themselves are audited and approved by nationally and internationally recognized accreditation boards, in order to demonstrate that its environmental management system complies with the ISO standard. DSS received its ISO 14001 certification on October 14, 2013.[26]

As part of the ISO 14001 certification, DSS is subject to annual re-certification audits, conducted by independent auditors, in order to verify that its environmental management system and associated procedures continue to meet ISO 14001 standards on an ongoing basis.[27] These efforts represent a meaningful, voluntary and pro-active undertaking on the part of DSS to

---

14001:2004 sets forth the criteria for an environmental management system (EMS). "It does not state requirements for environmental performance, but instead maps out a framework that a company or organization can follow to set up an effective environmental management system. Using ISO 14001 can provide assurance to company management and employees as well as external stakeholders that environmental impact is being measured and improved." *See* http://www.iso.org/iso/iso14000 (last visited November 29, 2013).

[26] *See* Exhibit B, Certificate of Approval, dated October 14, 2013 (certifying that DSS's environmental management system is compliant with the Environmental Management System Standard ISO 14001). This certificate was issued following a two stage audit that was conducted by Lloyd's Register, a well-respected Classification Society that is authorized by ISO to act as an independent ISO 14001 auditors and which was retained to determine whether DSS's environmental management system met the ISO 14001 criteria. The comprehensive auditing process conducted by Lloyd's Register consisted of two random vessel audits, and an audit of DSS's office performed over a period of three days.

[27] *See* Aseem Prakash, *Investing Up: FDI and the Cross-Country Diffusion of ISO 14001 Management Systems*, International Studies Quarterly (2007) 51, 726–727; *see also* EPA Position Statement on Environmental Management Systems and ISO 14001 and a Request for Comments on the Nature of the Data To Be Collected From Environmental Management System/ISO 14001 Pilots, 63 Fed. Reg. 12094 (1998); *see also* http://www.iso.org/iso/home/standards/management-standards/iso14000.htm (last visited November 29, 2013).

facilitate effective environmental management and compliance, which are "above and beyond" the requirements imposed by any international convention, law, or regulation.[28]

In addition, DSS revised its existing Management System to incorporate a number of Engineering Requirements for the vessels under its management to accomplish the following: (1) identify and secure Bilge Main Cross Connections that potentially could be utilized to improperly discharge bilge waste overboard;[29] (2) identify and secure Emergency Bilge Suctions to prevent improper discharges of bilge waste;[30] (3) enhance recordkeeping requirements (i.e., Oil Record Book verification through sounding records and shoreside reviews);[31] (4) implement a comprehensive Environmental Tag System for all valves and flanges that could be utilized to discharge bilge waste;[32] (5) identify and permanently secure all blank flanges;[33] (6) revise and enhance requirements regarding the maintenance and operation of the Oily Water Separator and Oil Content Meter; and, (7) monitor all oil-to-sea interfaces to ensure no pollution originated from this machinery.[34]

In order to verify the Engineering Requirements are complied with and its vessels are operated in compliance with the EEMS, DSS has adopted a vessel auditing protocol that requires audits be conducted by independent third party auditors (hereinafter, "the Independent Auditor"). Audit results are required to be reported to DSS's Environmental Management Representative

---

[28] *See United States v. Pflum*, 556 F. Supp. 2d 1254, 1264 (D. Kan. 2008) (noting that the defendant's post-offense corrective actions, which included revising the corporation's operations to ensure compliance with all applicable laws, were critical mitigating factors in determining the appropriate sentence to impose).

[29] *See* Exhibit C, Photographs demonstrating how Bilge Main Cross connections were secured.

[30] *See* Exhibit D, Photographs demonstrating how Emergency Bilge suction valves were secured.

[31] *See* Exhibit E, Email, dated January 4, 2013, Announcing Implementation of Oil Record Book Verification System.

[32] *See* Exhibit F, Photographs of Environmental Tag System, dated October 1, 2012.

[33] *See* Exhibit G, Photographs demonstrating how blanked flanges were secured.

[34] These already implemented Engineering Requirements are identical to the Engineering Requirements set forth in the government proposed ECP. DSS began voluntarily implementing these provisions in October 2013, on a proactive basis before it received the government proposed ECP on November 14, 2013.

(EMR),[35] who has been tasked with overseeing the implementation of the EEMS and for ensuring that all aspects of the Company's operations comply with the policies and procedures set forth in the EEMS.[36] The EMR reports directly to the President and Board of Directors of DSS and no one else. The EMR directs and relies on the EEMS Working Group, consisting of the Designated Person Ashore (DPA), the Technical Manager, the Crew Manager and the Environmental Management Representative (EMR), to take all corrective actions necessary to address any non-conformities found by the Independent Auditor and/or the Vessel Superintendents who conduct internal audits of the vessels, and to also recommend periodic revisions to the EEMS in order to implement the best operational practices of the maritime industry and adapt to amendments of relevant maritime environmental laws and regulations.

In addition to the above, the EEMS has also been revised and strengthened in respect to the existing and comprehensive employee and crewmember training program, to ensure the requirements of the EEMS, the regulations promulgated pursuant to MARPOL, the APPS, OPA 90, the Clean Water Act and DSS's "zero tolerance policy" for violations of maritime environmental laws and regulations, are known, understood and complied with by all DSS employees and crewmembers who serve on vessels managed by DSS. This training is, and will continue to be, supplemented with circulars and bulletins sent to all vessels in the fleet which serve as additional guidance to shipboard personnel regarding the Company's EEMS, policies and procedures.[37] The Company will also utilize Officer Conferences, which can also be

---

[35] The Environmental Management Representative (EMR), reports directly and only to the President of DSS and its Board of Directors. *See* Exhibit H, Organization Chart for DSS (it should be noted that the EMR is currently DSS's DPA, Mr. Gavrill. DSS has hired Mr. Gonidakis to serve as a dedicated EMR and Mr. Gonidakis will assume the position of EMR on December 16, 2013).

[36] *See* Exhibit I, Audit Report for the M/V ALIKI, Audit Performed October 15, 2103.

[37] *See* Exhibit J, Copies of DSS Circulars for the following topics: (1) Environmental Policy implementation; (2) Monitoring of potential sources of pollution; (3) Principles of Environmental Management; (4) Ship's Garbage

attended by the Court Appointed Monitor, to perform additional training and to ensure the DSS's corporate culture is one where environmental compliance is a top priority.

In this regard, top management of DSS will attend these Officer Conferences to ensure that all officers are aware of the critical importance the Company places on environmental compliance.[38] Similarly, members of DSS's Board of Directors, in addition to the regularly scheduled internal onboard audits conducted by DSS Superintendents, will randomly visit vessels operated by DSS to verify compliance with the EEMS, and to ensure all vessel personnel are on notice and are fully complying with DSS's commitment to environmental compliance.

DSS has also implemented a Fleet Engineer Survey that provides vessel crewmembers and officers with an opportunity to provide feedback regarding the implementation of the EEMS, and to suggest improvements to the EEMS and vessel operations. These surveys will provide valuable information that will allow DSS to judge the effectiveness of its shoreside and vessel training program,[39] and to continually evolve and improve its EEMS in response to the feedback received from vessel personnel.

---

Management under revised MARPOL Annex V regulations; (5) MARPOL Annex V – Garbage Record Book implementation; and, (6) Guidance for Recording of Operations in the Oil Record Book.

38 In addition, Mr. Gavriil, DSS's Environmental Management Representative (EMR), Designated Person Ashore (DPA), Chief Security Officer (CSO), and DSS's Crewing Manager, Captain Fotinos, will continue to provide crewmember training in the Philippines.  These training sessions take place at the crew manning agency in Manila, Philippines for all seafarers of Filipino nationality.  Additional training is also conducted at DSS's office in Greece for all seafarers of Greek nationality. A focus of the training is to provide all crewmembers with operational guidance for the vessels and notice of DSS's Zero Tolerance Policy for violations of its environmental compliance policy and procedures. *See* Exhibit K, Familiarization Program Introduction. Each attendee is required to execute a Familiarization Training Course form upon the completion of training, confirming they have received training on the EEMS, DSS's zero tolerance policy and its open and anonymous reporting system for non-compliance. *See* Exhibit L, Familiarization Training Course form. Training of crewmembers continues and is reinforced while crewmembers are aboard the ship at sea.   *See* Exhibit M, Pre-Boarding Declaration and Pre-Departure Certification of Environmental Compliance.  These onboard training sessions are conducted onboard all DSS managed vessels. Each month, a summary of all the training performed onboard is recorded as part of the Safety Meeting Minutes and will be reviewed by the EMR.

39 *See* Exhibit N, Example of Fleet Engineer Surveys completed by Engineers on the M/V ALIKI.

16

DSS has also implemented an Open Reporting System which provides an anonymous and confidential method for the crewmembers to report compliance related issues to the DPA.[40] Anonymous reporting will be accomplished through electronic mail or by calling a toll-free compliance hotline, which is maintained by DSS. [41] Crewmembers are informed through shore-side and onboard training that DSS has a non-retaliation policy for reports made pursuant to the Open Reporting System or by any other method.

DSS will continue its practice of not placing any budgetary restrictions on vessels for issues related to environmental compliance, including but not limited to, requests for shore disposal of bilge and sludge waste and requests for spare parts for the vessel's pollution prevention equipment. The Court will recall that DSS witnesses testified, at trial, that DSS's spare parts policy requires vessels to have "a spare for a spare," and the spare parts records introduced into evidence,[42] as well as the testimony of the crewmembers called by the government, each support this testimony. Additionally, several crewmembers testified at trial that spare parts were always provided by the company when requested and extensive spare parts inventories were regularly maintained onboard.

As Mr. Zafirakis, a DSS Director, testified at trial, DSS's long term success in the shipping market has been a direct result of its reputation and efforts to manage a compliant, modern and professional fleet of vessels.  Accordingly, DSS proactively implemented the EEMS in order to ensure first and foremost compliance with all environmental regulations on its operated vessels by its employees and to meaningfully address the apparent violation of its

---

[40] *See* Exhibit O, Poster Providing Notice of Open Reporting Hotline.
[41] In addition to a telephone hotline and a dedicate email address, the open reporting system can be accessed via DSS's website, http://www.dianashippingservices.com/index.php/our-services/hsqe/open-reporting-system.html.
[42] *See* Defendant's Trial Exhibit "9" and "9A," attached hereto collectively as Exhibit P.

17

compliance policies and procedures. As a result of the lessons learned in this case, DSS has revised and strengthened its  EEMS to ensure that operationally all of the vessels it manages are properly equipped and operated with the state of the art pollution control equipment, as well as, to ensure that its shoreside and seagoing personnel are properly trained in the company culture of zero tolerance regarding violations of any environmental regulations and that such policies become part and parcel of all vessels' operations and the day to day approach to such operations.

The EEMS is a living document and, as with all good Environmental Management Systems, it will be continually revised and amended to ensure that that it remains at the forefront of environmental compliance. DSS has demonstrated through the proactive revision and strengthening of the EEMS that it has the ability and resolve to make revisions, even if such revisions are costly, to ensure full environmental compliance by its vessels and personnel. As Mr. Zafirakis testified, its continued success and viability in the market place depends on having a first class environmental compliance program, well operated vessels and properly trained crews. The motivation to do so is not only strong, but critical to the business of DSS.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

While fully recognizing the intent, application and importance of the APPS statute in the United States' efforts to prevent pollution from ships, DSS submits that the Court's sentence in this case should be premised and designed to address and reflect the actual offenses contained in each count of conviction.

Although APPS is a statute related to the protection and preservation of the marine environment, it is a domestic law of limited applicability to foreign flagged vessels for acts committed on the high seas.  A fair and reasonable sentence for an APPS related violation

should, therefore, be fashioned to reflect the record-keeping nature of the offenses on which a defendant is convicted of.

With regards to Counts Five through Ten,[43] while these 18 U.S.C. § 1519 counts obviously contained different elements than the APPS counts, it is respectfully submitted that for each of the three port calls within the Eastern District of Virginia, the three corresponding offenses were part of the common scheme or plan to mislead Coast Guard inspectors into believing the vessel's Oil Record Book was accurate and complete during the September 22, 2012 port state control inspection. This assertion is borne out by the manner and means section of Count One of the Superseding Indictment, which specifically alleged that for each of the three port calls, the failure to maintain the vessel's Oil Record Book in violation of the APPS, the impediment of the Coast Guard's Port State Control inspection through the maintenance of the material false Oil Record Book, and the concealment of the bypass pipe, were interrelated acts that were committed by the *individual* Defendants as part of an ongoing criminal scheme.[44]

---

[43] DSS was also held vicariously liable for violating 18 U.S.C. § 1505, as charged in Count Eleven, for Defendant Prokakis' instruction to lower level crewmembers to lie to Coast Guard inspectors during their September 22, 2012 Port State Control inspection. It is respectfully submitted that the testimony at trial established that rather than acting in accordance with DSS's policies and procedures, Mr. Prokakis acted alone in instructing the crewmembers to lie in a desperate attempt to avoid being arrested and held personally liable for violations of the APPS and 18 U.S.C. § 1519.  Such actions stand in stark contrast to DSS's actions after the government commenced its investigation of the M/V THETIS. Specifically, CGIS Special Agent Root testified that during the course of his investigation, DSS fully cooperated with all requests made by the government.  *See* Exhibit S Transcript of Testimony of Special Agent Mark Root, dated August 5, 2013, at p. 23 ("Q: Now sir, during your investigation did you find Diana Shipping, my client Diana Shipping Services to be cooperative in your investigation? A: Yes."). This is the antithesis of the conduct of Mr. Prokakis, whose actions were motivated by self-preservation and exclusively for his own benefit.

[44] In this regard, the government, in its Response to the Defendants' Rule 29 Motion challenging the extraterritorial application of 18 U.S.C. § 1519, asserted that the actions of the individual Defendants were part of a continuing criminal offense. *See* Docket Entry # 96, at 4.  (government specifically argued that "the 18 U.S.C. §1519 violation was a continuing one..."); *see also* Docket Entry #30, at p. 6 (alleging the individual defendants, "did knowingly and willfully conspire, confederate and agree" as part of a single conspiracy to commit the acts charged in the eleven court Superseding Indictment). As such, the government has acknowledged that these counts did not charge a series of individual criminal offenses, but were instead part of a "continuous offense", which supports the argument that the counts should be "grouped" for the purposes of sentencing.  *See* U.S.S.G. §§ 1B1.1(d), 3D1.1(a), 3D1.2; *see also* *United States v. Wessells*, 936 F.2d 165, 168 (4th Cir. 1991)(holding that the purpose of grouping of counts is, "to prevent multiple punishment for substantially identical offense conduct").

The government will undoubtedly invite the Court to impose a sentence in this case for the maximum fine and probation period on the basis that the convicted violations are egregious and pervasive pollution events that must be punished to the extreme in order to send an appropriate message both to DSS and the rest of the industry.  However, the facts in this case, as they relate to DSS, do not support this argument for all the reasons set forth herein. With the exception of Count 11, all of the conduct that led to the convictions in this case occurred aboard the M/V THETIS while it operated on the high seas.

In this regard, if convictions for record keeping APPS violations and related offenses involving a foreign flag vessel are somehow permitted to be transformed into punishment at sentencing for acts of improper bilge waste discharges from a foreign flagged vessel anywhere in the world, it would improperly and unjustifiably distort the MARPOL Treaty, the existing laws of the sea (including the principle of exclusive flag state jurisdiction), the principles of sovereignty and comity, and the domestic APPS statute into one of extraterritorial, indeed, global reach.[45]

Such a result was never envisioned, nor intended, by any of the applicable maritime laws and treaties such as MARPOL, to which the United States and other seafaring nations are signatories. DSS respectfully urges the Court to reject such an invitation, and instead impose a fine that is both "sufficient, but not greater than necessary" and at the same time reflects the fact that DSS was held vicariously liable for its employees' breach of DSS's environmental

---

[45] *See* 33 C.F.R. §151.25; *see also U.S. v. Jho* 534 F. 3d 398, 403 (5th Cir. 2008) (holding, "[w]e read the requirement that the oil record book be 'maintained' as imposing a duty on a foreign-flagged vessel to ensure that it's oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."); *see also United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006)(holding that pursuant to the APPS and accompanying regulations, Congress and the Coast Guard created liability for foreign vessels and personnel only for those substantive violations of MARPOL/APPS that occur in U.S. ports or waters).

compliance policies and procedures, through the failure of Defendants Prokakis and Boumpoutelos to properly and accurately maintain the vessel's Oil Record Book.[46]

### D.   The Need for the Sentence to Adequately Deter Future Criminal Conduct

DSS submits that a fair and just sentence, premised on the offenses for which it was convicted, will help provide the necessary deterrence to the commercial shipping industry.  In this regard, APPS related prosecutions and the sentences imposed on vessel owners and operators are widely reported in the maritime industry press and trade journals, such as *Lloyd's List*, *Fairplay*, *Tradewinds*, *Maritime Reporter*, and numerous other industry publications, as well by as mainstream media outlets in the U.S. and other seafaring nations.  In this regard, since 2009, the U.S. Department of Justice has issued forty-seven (47) press releases for matters involving the criminal prosecution of vessel owners, operators, and crewmembers in MARPOL related environmental enforcement cases,[47] which press releases are picked up and reported by both the maritime and mainstream press outlets.

In addition to the individual stories written whenever these press releases are issued by the Department of Justice, there have been numerous pieces published in the maritime media regarding the consequences of non-compliance with MARPOL and APPS related regulations, for individual crewmembers and vessel owners and operators.  In order to address the issues raised by these prosecutions and to promote compliance with applicable maritime environmental laws are regulations, trade organizations such as Intertanko (the International Association of Independent Tanker Operators), Intercargo (International Association of Dry (Bulk) Cargo Ship

---

[46] *See* Exhibit A, Verdict Transcript, dated August 8, 2013, at p. 19 ("I do not find direct criminal liability on the part of Diana Shipping Services. I find it based upon the vicarious liability of the other two defendants. . .")
[47] *See* http://www.justice.gov/enrd/News.html (last visited November 29, 2013).

Owners), the International Chamber of Shipping (ICS), Baltic International Maritime Consulting Organization (BIMCO), The Oil Companies International Marine Forum (OCIMF) and International Shipping Federation (ISF), have held conferences and seminars that are well attended by vessel owners and operators, as well as representatives from the Coast Guard and Department of Justice. Maritime environmental compliance is clearly an area that already has the focus of the entire maritime community.

While the publication of prosecutions and sentences imposed, as well as the substantial efforts made by leading international maritime organizations to encourage dialogue on the compliance issues have had their own impact on deterring unlawful conduct , the fact that DSS has already incurred and paid a substantial amount as a result of this prosecution, including payments totaling $678,558.80, to maintain the crewmember witnesses and defendants pursuant to the Agreement on Security, serves to further deter any future violations of applicable U.S. law.[48] Specifically, this significant sum, which was incurred by DSS as costs to maintain the crewmembers in Norfolk during the course of the investigation, and not by the government, serves as a substantial deterrent to DSS and other ship managers, and as encouragement to the shipping industry and vessel owners and operators to take all necessary precautions to ensure that the crews serving aboard the ships they manage obey the law, maintain accurate records and logs and fully cooperate with Coast Guard inspectors.  DSS respectfully submits the Court should take into consideration the sum of $678,558.80 that has already been paid by DSS, when determining the amount of any fine to be imposed in this matter.

---

[48] *See* Exhibit Q, Spreadsheet Documenting Expenses Incurred by DSS to Maintain Crewmembers in Norfolk.

**E.     The Need for the Sentence to Protect the Public from Further Crimes of the Defendant**

As set forth above, following the detention of the M/V THETIS, DSS undertook a proactive comprehensive review of its management system and determined that additional steps and revisions were necessary to ensure environmental compliance. This resulted in the implementation of an Enhanced Environmental System, which included the following: (1) extensive crewmember training on the provisions of the EEMS, with a focus on environmental compliance; (2) physical modifications of vessel engine rooms to prevent unauthorized discharges of bilge waste; (3) regular shore-side reviews of oil record books and sounding records to detect anomalies in these records and prevent improper discharges of bilge waste; (4) utilization of an independent auditor to inspect and examine vessels to determine if they are operated in compliance with the EEMS and all applicable maritime environmental laws and regulations; (5) implementation of an open reporting system to permit crewmembers to anonymously report any compliance related issues; (6) conducting officer training conferences with a focus on the policies and provisions of the EEMS and DSS's zero tolerance policy for violation of these policies; (7) regular distribution of circulars to vessels to inform crewmembers of industry best practices on environmental compliance issues and to publicize DSS's non-retaliation policy for reporting environmental compliance related issues; and, (8) unannounced visits to vessels by the Top Management of DSS to demonstrate to crewmembers the importance DSS places on environmental compliance.

It is respectfully submitted that this proactive effort, which began less than one month after the M/V THETIS was detained and more than ten months prior to the Court's verdict in this action, addresses this factor and effectively protects the public from this type of conduct in the future on the part of DSS and its employees.

23

### F.     The Kinds of Sentences Available

As DSS is an organizational defendant, it can be sentenced to a fine and a term of probation. *See* 18 U.S.C. § 3551(c).  The statutory maximum fine for each count for which DSS was convicted is $500,000.  *See* 18 U.S.C. § 3571(C)(3).   There is no mandatory minimum fine for any of the counts of conviction. For the reasons set forth below, DSS respectfully urges the Court to impose a fine of $400,000 and a term of probation of three (3) years.

### G.     Pertinent Policy Statements

DSS is not aware of any applicable policy statement of the Sentencing Commission.

### H.     The Need to Avoid Unwarranted Sentencing Disparities

It is axiomatic that defendants with similar backgrounds which have been found guilty of the same offenses should receive similar sentences.  *See Dorsey v. United States*, 132 S. Ct. 2321, 2334 (2012); *see also United States v. Amaya*, 2013 U.S. App. LEXIS 6223 (4th Cir. 2013); 28 U.S.C. § 991(b)(1)(B) (stressing the need to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct").  Although this principle is expressed in 18 U.S.C. §3553(a)(6), it is referenced in this section of the Memorandum because the primary sentencing decision for the Court with respect to organizational defendant DSS is the amount of any fines to be imposed for the counts of conviction.

To assist the Court in its determination of an appropriate fine with respect to DSS, a table is attached as Exhibit T, which summarizes APPS prosecutions in the United States since 2007, involving allegations of illegal activity on a single vessel (as has been alleged in this action), owned and/or operated by a "first time offender."  The table summarizes relevant information from forty-five (45) cases, including: the case caption and docket number; the size and type of

24

the vessel involved in the violations; the counts of conviction, and the sentence imposed. This table also illustrates a number of important distinguishing facts and factors concerning prior APPS prosecutions, each of which are relevant to the determination of the sentence in the instant case.

First, the vast majority of the cases were resolved by way of a negotiated plea agreement, which generally results in fewer counts being charged and an "agreed upon" fine amount calculated by mutual consent under the Alternative Fines Act that occasionally exceeds the statutory maximum for the counts of conviction.

Second, thirty-one of the forty-five cases listed in the table resulted in criminal fines of $1,300,000 or less, and a significant number of the cases involved fines that were substantially below that amount.

Third, a three year term of probation was imposed in the overwhelming majority of these cases.

DSS submits that, as more fully discussed herein, there are numerous factors in this case that weigh heavily in favor of a criminal fine that is substantially below the typical fines imposed in the APPS cases summarized in Exhibit T. In this case, there was substantial mitigating evidence to demonstrate that DSS has a long and extensive record of environmental compliance across its vessel fleet, and that this case was its first contact with the criminal justice system. Notwithstanding the testimony introduced at trial regarding certain activities aboard the M/V THETIS, there was undisputed evidence at trial that demonstrated, in all other aspects of its business operations, maritime and shore-based, DSS is a responsible corporate citizen that values and invests significant resources in achieving environmental compliance. As the Court determined when announcing its verdict, there was no evidence that DSS ever engaged in any

25

direct criminal act, but was instead held vicariously liable purely for the acts of its former employees.

DSS is not attempting to downplay or minimize the Court's findings. Rather, and as demonstrated by the fact that following the detention of the M/V THETIS on September 22, 2012, DSS undertook numerous proactive measures to strengthen the company's overall compliance program – actions that accurately reflect DSS's corporate character and culture as one which has consistently stressed environmental compliance in all of its operations. In addition, DSS fully cooperated with the government's investigation, which included incurring costs of $678,558.80 to date to maintain the crewmembers detained in Norfolk at the request of the government. These efforts distinguish DSS from the other defendants that are listed in Exhibit T, and are mitigating factors that must be considered in determining the appropriate fine in this action.

## I.       Restitution

As set forth in the Presentence Investigation Report, dated November 22, 2013, there are no identifiable victims and therefore restitution is unnecessary and inappropriate in this action.

## III.       Section 3572 Factors

In addition to considering the factors set forth in 18 U.S.C. § 3553(a), the Court is also required to consider the factors set forth in 18 U.S.C. § 3572, to determine the appropriate fine for DSS. These factors are as follows.

### A.       Company's Size and Income are Matters of Public Record

As reported to the Department of Probation, DSS has seventy-six (76) full time employees, who assist in the management of thirty-six (36) ocean going dry-cargo vessels. In

accordance with the management agreements between DSS and the owners of each of the individually managed vessels, DSS receives a fixed management fee.  The management fees constitute the bulk of DSS's annual revenue.[49] Together with DSS's current assets and liabilities, which have been accurately summarized in the Pre-sentence Investigation Report, these fees provide DSS with the financial wherewithal to pay the proposed fine of US$400,000 in a single payment.

### B.      No Pecuniary Loss Was Inflicted Upon Others, Therefore No Restitution Should Be Ordered

As set forth in the Presentence Investigation Report, dated November 22, 2013, the convictions in this case did not result in any pecuniary loss. As such, there were no victims in this case and there is no need to order restitution as part of the sentence in this matter.

### C.      DSS Derived No Pecuniary Gain From The Offenses

While DSS was held vicariously liable for the acts of Defendants Prokakis and Boumpoutelos, their actions did not result in any pecuniary gain for DSS. Each of the witnesses of Filipino descent who testified at trial confirmed that the M/V THETIS was supplied with ample spare parts for its pollution control equipment (i.e., the incinerator, oily water separator and oil content meter), and the vessel regularly replaced the filters of the oily water separator to ensure it could be utilized to treat and discharge bilge waste generated by the vessel. Moreover, DSS placed no monetary restrictions on the vessels' crews in what could be spent for compliance with all regulations, including the amounts to be spent for putting bilge wastes ashore.

---

[49] For example, in 2012 DSS collected total management fees of $12,102,000. The only other source of income for DSS was interest, totaling $76,000. During this same year, 2012, DSS had expenses of $8,976,000, for a net annual income in 2012 of $3,126,000.

27

Accordingly, there was simply no pecuniary gain recognized by DSS as a result of the individual defendants' conduct.

### D. The Expected Cost Of Monitoring DSS's Compliance With The Terms Of Probation

In Section VII below, DSS proposes, in order to facilitate the Court's and Department of Probation's monitoring of DSS's compliance with the requirements of the EEMS and its terms of probation, the appointment of a Court Appointed Monitor (CAM). The costs associated with CAM performing its audits and review of DSS's operations will be paid by DSS. It is respectfully submitted that the incursion of these costs by DSS must be considered as mitigation of any fine amount that might be imposed by the Court.

### E. Disciplinary Actions Taken By DSS

While DSS has continued to pay for the lodging costs and per diems for Defendants Prokakis and Boumpoutelos to facilitate the legal process and to ensure these individuals would be able to remain in Norfolk pending the sentencing hearing, DSS immediately terminated the individual Defendants' salary payments once the Court issued its verdict on August 8, 2013. Defendants Prokakis and Boumpoutelos will never be re-hired by DSS in the future.

### IV. Additional Evidence Supporting Mitigation Of The Sentence To Be Imposed

### A. DSS Fully Cooperated with the Government's Investigation and Incurred Significant Costs to Maintain The Detained Crewmembers So They Could Appear At Trial

The U.S. Coast Guard detained the M/V THETIS in September 22, 2012 and demanded the Owner and Operator of the vessel execute an Agreement on Security in order to obtain the

release of vessel from its Customs hold.[50]   The Agreement on Security required DSS to maintained the eight (8) crewmembers of the MV THETIS who were detained in Norfolk, pay a $55.00 daily per diem for each detained crewmember, continued payment of the salaries of the detained crewmembers, pay for the medical care and transportation for each crewmember, and pay for their repatriation.

In accordance with the Agreement on Security, DSS has fully cooperated with the Coast Guard and handled all conceivable logistics, to ensure the government's attorneys and investigators could meet with the detained crewmembers, prepare its case and have each witness appear at trial. In this regard, from September 2012 until the completion of trial on August 8, 2013, DSS paid $678,558.80 in payment of the individual crewmembers salaries, as well as their hotel accommodations, per diems and medical and transportation expenses.[51]   This is a substantial financial burden incurred by DSS to facilitate the government's prosecution, which must be considered when determining the appropriate fine amount and sentence in this case.

DSS's cooperation with the government's investigation was confirmed at trial during the testimony of Special Agent Mark Root, the Coast Guard's lead criminal investigator from the Coast Guard Investigative Service.[52]   Through this cooperation, DSS not only assisted the government with its investigation and prosecution of this matter, but it also saved the U.S.

---

[50] See Exhibit R, Agreement on Security, dated October 2, 2012.

[51] See Exhibit Q, Spreadsheet Documenting Expenses Incurred.  Had DSS chosen to abandon its crew and refuse to acquiesce to the government's demands, the cost of the government's prosecution, including housing, feeding and witness fees, would have been placed squarely on the shoulders of the government and the taxpayers. See United States v. Angelex, ltd. 723 F.3d 500, 507 (4th Cir. 2013). In fact, this very scenario recently played out in the M/V ANTONIOS PAPADAKIS matter.  In that action, the vessel's Owner, Angelex Ltd. and Operator, Kassian Maritime Navigation Agency Ltd., refused to agree to any terms of an Agreement on Security, which forced the government, and by extension, US taxpayers, to incur substantial expenses to investigate and prosecute the case, including the maintenance of crewmember witnesses.  This was not the case in the instant matter, where the bulk of the costs of the investigation were borne by DSS, rather than the government.

[52] See Exhibit S Transcript of Testimony of Special Agent Mark Root, dated August 5, 2013, at p. 23 ("Q: Now sir, during your investigation did you find Diana Shipping, my client Diana Shipping Services to be cooperative in your investigation? A: Yes.").

taxpayers hundreds of thousands of dollars by maintaining the government's witnesses in the United States.[53] It is respectfully submitted that these efforts should be credited and taken into account when determining the appropriate fine.

It is respectfully submitted that when the Court takes into consideration the $678,558.80 been paid to date by DSS to maintain the government's witnesses and the individual Defendants in Norfolk, the undisputed evidence that DSS has fully cooperated with the government during the course of its investigation, the Court's finding that DSS never engaged in any direct criminal conduct, and the fact that in the majority of APPS related prosecutions the fine imposed was $1,000,000 or less,[54] the appropriate sentence in this matter, pursuant to the grouping principles discussed in Section V below, should be a fine amount of not more than $400,000.

## V.     Grouping of Counts

DSS respectfully submits that in determining the appropriate fine to impose, the Court should group the counts of conviction into four groups.  With regards to the amount of the fine to be imposed for each of these groups, the Court should consider the $678,558.80 previously paid by DSS to maintain the crewmember witnesses and individual defendants in Norfolk as part of the total monetary penalty. In addition, DSS proposes a fine the amount of $400,000, for a total penalty of $1,078,558.80 - a sentence that is in accord with the majority of fine amounts imposed on first time offenders.[55] It is respectfully submitted that the fine should be equally divided

---

[53] The "material witness statute", 18 U.S.C. § 3144, provides the government with a procedure to temporarily detain witnesses in criminal case. However, once detained pursuant to 18 U.S.C. § 3144, it is the government's obligation to maintain the witness and provide witness fees and a subsistence allowance, which would have approximated the amounts paid by DSS for housing and per diems.  However, the government did not incur these costs in this case as DSS paid to maintain the crewmember witnesses and the individual defendants in Norfolk.

[54] *See* Exhibit T, Table Summarizing Relevant Prosecutions.

[55] For the forty-five cases that are summarized in Exhibit T, the median total criminal penalty imposed on a first time offender in APPS related prosecutions was $1,200,000.

between the four groups, or $100,000 per group. Such a fine, together with the special condition of probation discussed herein, will adequately satisfy the enumerated statutory objectives and requirements of 18 U.S.C. §3553 and 18 U.S.C. §3572 and the Court's "overarching" duty to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011).

When a defendant is convicted of multiple counts, courts are required to determine whether the counts arise from the same act or transactions and, therefore, "grouped" for the purposes of sentencing. *See* U.S.S.G. §§ 1B1.1(d), 3D1.1(a), 3D1.2; *see also United States v. Wessells*, 936 F.2d 165, 168 (4th Cir. 1991); *United States v. Patterson*, 962 F.2d 409, 417 (5th Cir. 1992). Specifically, for counts involving the same acts or transactions connected by a common scheme or plan, or which involve the same harm, grouping ensures convictions for such acts will not result in the imposition of an inappropriately harsh sentence. *See* U.S.S.G. § 3D1.2(b). The policy goals of grouping are two-fold: first, to "ensure incremental punishment for significant additional criminal conduct"; and second, somewhat in tension with the first, "to limit the significance of the formal charging decision…to prevent multiple punishment for substantially identical offense conduct." *United States v. Toler*, 901 F.2d 399, 402 (4th Cir. 1990). Accordingly, grouping seeks to ensure that "convictions on multiple counts do not result in a sentence enhancement unless [the multiple counts] represent additional conduct that is not otherwise accounted for by the guidelines." *Id.*

In this action, the eleven (11) counts can be divided into four individual groups, a group for each of the counts that involve the same acts or transactions, which are related by a common scheme or plan.

### A.     Group One – Conspiracy

As set forth in the Superseding Indictment, the objects of the conspiracy identical to the substantive violations charged in Counts Two through Ten.  Specifically, Count One charged the individual Defendants were involved in a common-scheme and plan to violate the Act to Prevent Pollutions from Ships, 33 U.S.C. § 1908, as charged in Counts Two, Three and Four, and to violate 18 U.S.C. § 1519, as charged in Counts Five, Six, Seven, Eight, Nine and Ten, by failing to accurately maintain the vessel's Oil Record Book, by intentionally impeding a Coast Guard inspection through the maintenance of a materially false Oil Record Book, and by the intentional concealment of the bypass pipes wherever the M/V THETIS entered U.S. waters. Clearly, the Superseding Indictment charged that the conspiracy had a single unified purpose; to conceal the false entries in the vessel's Oil Record Book whenever the vessel entered U.S. waters. Pursuant to U.S.S.G. §3D1.2, since the continuing offense charged in Count One involved substantially the same harm, this Count should be considered as a separate "group" for purposes of sentencing.[56]

### B.     The Remaining Three Groups Relate To Each Of The Three Port Calls To The Eastern District Of Virginia

In *United States v. Bartley*, 230 F.3d 667, 670 (4th Cir. 2000), the Fourth Circuit held the authority to group closely related counts was intended to provide the sentencing judge with the "means to check a prosecutor's power to manipulate," the charges in order to improperly

---

[56] In its Response to the Defendants' Rule 29 Motion for A Judgment of Acquittal challenging the extraterritorial application of 18 U.S.C. § 1519, the government freely acknowledged, and in fact argued,  that Counts Five through Ten were part of a "continuing criminal offense." *See* Docket Entry # 96, at 4 (stating "[T]he 18 U.S.C. §1519 violation was a continuing one..."). The government's assertion that these Counts were part of a single, continuing offense provides further support that these counts should be grouped to avoid an overly harsh sentence resulting from the government splitting a continuous criminal offense into multiple counts. *See United States v. Toler*, 901 F.2d 399, 402 (4th Cir. 1990)(holding that when the evidence adduced at trial demonstrates that multiple counts relate to a single, continuing offense, these counts should be grouped together for purposes of sentencing).

"enhance" the defendant's potential sentence by charging multiple counts for the same underlying conduct. *See id.* Accordingly, the sentencing court is required to examine the specific conduct charged in the indictment and the evidence introduced at trial to determine which counts should be grouped together. *See id.*

DSS respectfully submits that an examination of the specific conduct charged in Counts Two through Ten of the Superseding Indictment will result in the grouping of these counts into three distinct groups, with one group for each of the M/V THETIS's three port calls within the Eastern District of Virginia (i.e., the port calls on May 2, 2012, July 8, 2012 and September 22, 2012).[57]  For each port call, DSS was held vicariously liable for three separate violations arising from entries and/or omissions in the vessel's Oil Record Book and efforts to conceal such entries and omissions from the Coast Guard.  Specifically, Counts Two, Five and Eight all relate to the May 2, 2013 port call; Counts Three, Six and Nine all relate to the July 8, 2013 port call; and, Counts Four, Seven and Ten all relate to the September 22, 2013 port call.  The three counts for each port call, although different from a temporal perspective, arise from substantially identical conduct in a common scheme or plan, and involve the same harm. Specifically, the maintenance of an inaccurate Oil Record Book prior to the port call, and the concealment of the inaccuracies and the so-called "bypass pipes," while the M/V THETIS was in US waters.[58]

---

[57] DSS respectfully submits that it should not receive a fine for Count Eleven as the conduct charged in this count related to Defendant Prokakis' attempts to avoid detection and arrest for his failure to accurately maintain the vessel's Oil Record Book.  Prokakis' motivation was not to benefit his employer, DSS, but was instead self-preservation in the hopes that his fellow crewmembers would not cooperate with Coast Guard inspectors. In contrast, the government's lead case agent acknowledged that at all times DSS fully cooperated and facilitated the investigation conducted by the Coast Guard. *See* Exhibit S, Transcript of Testimony of Special Agent Mark Root, dated August 5, 2013, at p. 23. Accordingly, although DSS was held vicariously liable for this count, it should not be considered when determining the appropriate sentence to impose on DSS.

[58] As charged in the Superseding Indictment, during each of these three port calls, the vessel's crewmembers failed to properly maintain the vessel's Oil Record Book. *See* Docket Entry No. 30, Superseding Indictment, at Counts Two through Four.  In furtherance of the failure to properly maintain the Oil Record Book, the same crewmembers concealed so-called "bypass pipes" to prevent the pipes from being discovered while the vessel was in port. *See id.*,

The acts charged in these nine Counts, three for each port call, are essentially identical, but for the date of the relevant port call. The government has argued that all of these acts were part of a common scheme and plan to conceal the inaccurate entries made in the Oil Record Book.  Accordingly, the harm caused by these acts was the maintenance and/or presentment of a false Oil Record Book, thereby misleading and/or potentially misleading the U.S. Coast Guard from discovering the truth as to how bilge waste was actually being handled onboard the vessel. The only distinguishing characteristic for these charges is the date the M/V THETIS was in U.S. waters. It is respectfully submitted that it would be appropriate for sentencing purposes for the Court to group the offense conduct for the nine charges into three separate groups for each of the three port calls, which together with the conspiracy count would result in four groups and assess a fine of $100,000 for each group.

## VI.    Probation

DSS submits that a three year term of probation is reasonable and appropriate under the circumstances of this case. As more fully discussed below, this term of probation will provide the jointly nominated and court appointed CAM with sufficient time to audit each of the vessels managed by DSS during the three year period.  Specifically, DSS proposes that as part of the special condition of Probation the CAM audit thirty-three percent (33%), or twelve (12) of the thirty-six (36) vessels managed by DSS for each of the three years of probation, thereby resulting in all of the managed vessels being audited in the course of the probation period. Reports of these audits will be provided to DSS, the Department of Justice, the Department of Probation and the U.S. Coast Guard.

---

at Counts Five through Ten. *See* Docket Entry # 96, at 4.  (where the government asserted, "the 18 U.S.C. §1519 violation was a continuing one...").

Furthermore, a review of the sentences of probation imposed in the cases listed in Exhibit T confirms that a three year term of probation was imposed in the vast majority of these cases. Clearly, the government has previously agreed that a three year term of probation provides sufficient time for the Court, the CAM and the government to confirm the compliance of the organizational defendant with the terms of the environmental compliance program and its probation. Accordingly, DSS respectfully submits that it be sentenced to a three year term of probation.

## VII.    Special Terms of Probation

Notwithstanding the size of its managed vessel fleet (i.e., thirty-six (36) vessels), and the significant number of port calls the vessels make throughout the world, including the United States, DSS has never before, or since, been the subject of a criminal investigation for the violation of any maritime environmental law or regulation.  In this regard, DSS's Pre-sentence Investigation Report confirms that DSS is a first-time offender that has never previously been criminally prosecuted. DSS fully understands that its record of environmental compliance does not negate the verdicts rendered by this Honorable Court.  However, it is respectfully submitted that the foregoing information compellingly demonstrates a broad pattern of responsible corporate activity over time by DSS.

In the immediate months following the initiation of the U.S. Coast Guard investigation that led to the prosecution of this case and continuing throughout 2013, DSS took and continues to take substantive and proactive steps to strengthen its on board and shoreside operations and environmental compliance program for its managed fleet of vessels in order to prevent in the future the type of illegal conduct that occurred in this matter.  DSS summarizes the following

actions taken in response to the detention and subsequent investigation of the M/V THETIS before there was a conviction in this matter:

i.   A Management Review meeting was conducted in October 2012 to discuss the M/V THETIS incident and the steps to be taken to revise the existing Management System to address this incident;

ii.  An independent incident investigation was conducted to determine the root cause of the incident in light of the Company's "no-blame" policy and to develop corrective and preventative actions to avoid a recurrence;

iii. In response to the Management Review meeting and the independent investigation of the incident, it was determined that DSS would revise its Environmental Policy, including amendments to the Company's Vision, Mission and Policies statements, to reflect DSS's commitment to the protection of the environment;[59]

iv.  Enhancement of the existing Management System, to include a specific Enhanced Environmental Management System ("EEMS"), to ensure full compliance with all applicable international and US environmental laws and regulations, including MARPOL, APPS, the Clean Water Act and OPA 90;

v.   The EEMS and DSS operations were audited by an independent and qualified inspector who certified that DSS's EEMS meets the ISO 14001 Environmental Management System Standard;[60]

vi.  DSS established and appointed  a Company Environmental Compliance Manager ("ECM");[61]

vii. DSS created  an Enhanced Environmental Management System Working Group, working under the leadership of the Company's President and consisting of the Company's DPA (Designated Person Ashore), Technical Manager, Crew Manager and ECM, to ensure the EEMS is continuously updated and revised and corrective action is promptly taken in response to any incident of non-compliance;

viii. DSS implemented revised Engineering Requirements that cover the same Engineering Requirements incorporated in the government's proposed ECP, but are even more robust and comprehensive;[62]

ix.  A Declaration of Compliance was created and introduced to the entire Company, which was signed by all employees, acknowledging their understanding of the

---

[59] This information can be accessed on DSS's website, www.dianashippingservices.com.
[60] See Exhibit B, ISO 14001 Certification for DSS.
[61] *See* Exhibit H, Organization Chart for DSS.
[62] *See* Exhibit C, Photographs demonstrating how Bilge Main Cross connections were secured; *see also* Exhibit D, Photographs demonstrating how Emergency Bilge suction valves were secured; Exhibit E, Email, dated January 4, 2013, Announcing Implementation of Oil Record Book Verification System; Exhibit F, Photographs of Environmental Tag System, dated October 1, 2012; Exhibit G, Photographs demonstrating how blanked flanges were secured.

Company's Policies and Procedures, including all Environmental Policies, Procedures, Rules and Regulations;[63]

x.     An Independent Auditor was retained to conduct vessel audits to gauge compliance with the EEMS and all applicable maritime environmental laws and regulations. As stated above, DSS requests that the jointly nominated CAM take over this role post sentencing;[64]

xi.    DSS initiated a Fleet Engineering Survey that requests feedback from all vessel personnel in order to evaluate compliance with the EEMS and identify potential areas that require additional training;[65]

xii.   Enhanced Computer Based Training was created at training facilities in Manila to ensure crewmembers are familiar with DSS's EEMS and its policies and procedures prior to joining a vessel that is technically managed by DSS. Training topics include: the EEMS, MARPOL, Non-Tank Vessel Response Plans, Oil Record Book regulation and garbage management and record keeping;

xiii.  Officer Conferences are scheduled to be held in Greece to ensure all officers serving on vessels managed by DSS are fully familiar with the EEMS and DSS's corporate culture of environmental compliance.  These conferences will be attended by Top Management of DSS to ensure the participants are fully aware of the importance DSS's places on environmental compliance;

xiv.   An Open Reporting System was created and implemented which allows crewmembers to make anonymous reports to the DPA via email or through a toll free environmental compliance hotline or through the DSS website, on a non-retaliatory basis;[66]

xv.    Random shipboard visits by members of DSS's Board of Directors are conducted to verify compliance with the EEMS and to personally communicate the importance of environmental compliance to individual crewmembers; and,

xvi.   Company Circulars are distributed to all vessels managed by DSS regarding pollution prevention practices and reinforcement of Company Policies and Procedures addressing pollution prevention.  These Circulars are discussed at Safety Meetings onboard the vessels, as well as during visits to the vessels by Superintendents and Managers of DSS.[67]

---

[63] *See* Exhibit M, Pre-Boarding Declaration and Pre-Departure Certification of Environmental Compliance.

[64] *See* Exhibit I, Audit Report for the M/V ALIKI, Audit Performed October 15, 2103.

[65] *See* Exhibit N, Example of Fleet Engineer Surveys completed by Engineers on the M/V ALIKI.

[66] *See* Exhibit O, Poster Providing Notice of Open Reporting Hotline.

[67] *See* Exhibit J, Copies of DSS Circulars for the following topics: (1) Environmental Policy implementation; (2) Monitoring of potential sources of pollution; (3) Principles of Environmental Management; (4) Ship's Garbage Management under revised MARPOL Annex V regulations; (5) MARPOL Annex V – Garbage Record Book implementation; and, (6) Guidance for Recording of Operations in the Oil Record Book.

All of these efforts were proactively undertaken by DSS on its own volition after the M/V THETIS was detained on September 22, 2013, to ensure DSS's management system would be a stand-alone, comprehensive environmental compliance system that covers both shoreside and vessel operations. In this regard, the EEMS has been reviewed by an independent third party auditor who certified that DSS's environmental management system was ISO 14001 compliant.

In accordance with this certification, the EEMS requires enhanced crewmember training, both prior to an individual crewmember joining a vessel and continuous training while the crewmembers serve on the vessel. This training is critical as the EEMS sets forth the policies and procedures that must be followed on a day-to-day basis by every officer and crewmember, as well as shoreside employees, to ensure environmental compliance. To determine compliance with the EEMS, every vessel managed by DSS is also audited internally, by the vessel's technical superintendent, the vessel's assigned Port Captain, and personnel from the Health, Safety, Quality & Environmental Compliance Department and externally, by an independent auditor that has been retained by DSS.  Furthermore, the engineering requirements of the EEMS have been implemented onboard every vessel managed by DSS in order to prevent any improper discharge of bilge waste.  DSS is currently conducting an ongoing Fleet Engineering Survey, in order to obtain feedback on the implementation of the EEMS, and this feedback is being evaluated so that it may be incorporated into the EEMS to address any compliance concerns raised by the vessel's crewmembers. In addition, an anonymous open reporting system has been implemented so vessel crewmembers can report any compliance related issue by telephone, by email or through DSS's website, on a non-retaliatory basis. The EEMS is a "living" compliance system that is currently being utilized and continually strengthened to ensure the M/V THETIS

38

action will remain an isolated incident, never to be repeated on another vessel that is managed by DSS.

In contrast, the government's proposed Environmental Compliance Plan (ECP), submitted with the government's objections to the initial Pre-sentence Report, is a generic compliance program that is not tailored to DSS's operations.[68] The government proposed ECP is not nearly as comprehensive or robust as the EEMS and fails to consider the nature of DSS's fleet, the types of vessels it operates, the structure of its crewing, technical management, and health, safety, quality and environmental (HSQE) departments. Similarly, while the government proposed ECP calls for DSS to implement engineering requirements on its vessels, revise its training protocols, implement an open reporting system, adopt a protocol for reviewing entries made in the vessels' Oil Record Books, etc., these steps have already been taken by DSS through its implementation of the EEMS, as specified above. Accordingly, it would be entirely inefficient and contrary to the public's interest to "scrap" the existing ISO 14001 compliant EEMS, which is currently in use and under which the DSS personnel have been, and continue to be, trained and

---

[68] The ECP proposed by the government would require the Court Appointed Monitor to conduct audits of all thirty-six vessels managed by DSS, every year, for a proposed five year term of probation, for a total of at least one-hundred eighty (180) vessel audits. Pursuant to the terms of the government's proposed ECP, all of these audits are to be conducted while the vessels are underway. This underway audit provision is proposed by the government despite the fact that nine of the vessels managed by DSS are large, Capesize bulkers, which due to their size, cannot transit the Suez or Panama canals, but instead must undertake voyages that last several weeks in order to steam around the Cape of Good Hope and Cape Horn. Due to the length of these voyages, an auditor who would normally attend the vessel for one or two days to perform an "underway" audit would be required to remain on the vessel for nearly a month to perform a single audit. The government is well aware that requiring 100% of vessel under management to be audited underway, every year, is a punitive measure that will not ensure the vessels are operated in compliance with the ECP, but will instead unnecessarily drive up DSS's costs to comply with this proposed special condition of probation. In this regard, the Department of Justice and Coast Guard normally agree to ECPs where the auditor is permitted to equally divide its audits between underway, on voyages of short duration (i.e., two to three days), and audits conducted while the vessels are in port. Furthermore, such audits are normally conducted during the standard three year term of probation, with only a percentage of the fleet being audited during each year of probation. Accordingly, DSS proposes the jointly nominated CAM be given discretion to schedule underway and in port vessel audits, and also audit one third of the fleet during each of the three years term of probation. This will provide the CAM with more than a sufficient number of audits to determine if vessels managed by DSS are complying with the EEMS and the terms of DSS's probation. Of course, the CAM would have the discretion to conduct additional audits if the circumstances warrant it.

operating, in favor of a generic ECP that is not as comprehensive and will require implementation of some, but not all, of the elements of the EEMS and will further require the DSS personnel to be re-trained to meet the less comprehensive mandates of the government proposed ECP, which will result in an exercise of pure inefficiency and confusion.

DSS respectfully requests that the Court continue to permit it to operate pursuant to the EEMS, with compliance being audited, determined and reported by a Court Appointed Monitor (CAM). In this regard, DSS proposes coordinating with the government to jointly nominate a CAM for the Court's consideration. Once appointed, the CAM will be provided a period of thirty (30) to sixty (60) days to review the DSS EEMS and the government's proposed ECP, and recommend to the Court which program, or parts thereof, should be required as a special condition of probation. Once the Court evaluates the recommendation of the CAM, it can impose the recommendation as a special condition of probation and the CAM can commence its periodic auditing of DSS vessels, as it determines would be necessary, to ascertain compliance, and provide periodic reports of such audits to the Department of Probation, the Department of Justice and the Coast Guard to ensure all parties have the necessary information to determine if DSS is in full compliance with the special condition of probation and all applicable U.S. and international maritime environmental laws and regulations.

## VI.    Conclusion

For the reasons discussed above, DSS respectfully requests this Honorable Court group the counts of conviction into four groups and impose a fine of no more than $100,000 for each of the groups, for a total fine of $400,000. DSS also respectfully submits that the Court impose a three year term of probation, accept DSS's existing EEMS as the compliance program for the duration of the probation period, and appoint a jointly nominated Court Appointed Monitor to

conduct vessel audits and provide periodic audit reports to the parties, the Department of Probation and the United States Coast Guard.

<div style="margin-left: 50%;">

Respectfully submitted,

s/Trey r. Kelleter
Trey R. Kelleter (VSB No. 41606)
*Attorney for Diana Shipping Services, S.A.*
Vandeventer Black, LLP
101 W. Main Street
Suite 500
Norfolk, VA 23510

s/Michael  G. Chalos
Michael G. Chalos
Brian T. McCarthy
*Attorneys for Diana Shipping Services, S.A.*
*ADMITTED PRO HAC VICE*
Chalos O'Connor, LLP
366 Main Street
Port Washington, NY 11050

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of November, 2013, I served the foregoing

Sentencing Memorandum via the Court's electronic notification system on the following:

Joseph Kosky
Assistant United States Attorney
  for the Eastern District of Virginia
101 West Main Street
Suite 8000
Norfolk, VA 23510-1671
(757) 441-6331
Joseph.Kosky@usdoj.gov

Kenneth Nelson
Environmental Crimes Section
Environment and Natural Resources Division
United States Department of Justice
601 D St. NW, Suite 2814
Washington, DC 20004
(202) 305-0435
Kenneth.Nelson3@usdoj.gov

Carl R. Woodward, III
Carella, Byrne, Cecchi, Olstein, Brody
& Agnello, P.A.
5 Becker Farm Road
Roseland, NJ  07068

Michael K. Twersky
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA  19103

Lawrence H. Woodward, Jr.
Shuttleworth, Ruloff, Swain, Haddad
& Morecock, P.C.
4525 South Boulevard, Suite 300
Virginia Beach, VA  23452

Michael G. Chalos
Brian T. McCarthy
Chalos O'Connor, LLP
366 Main Street
Port Washington, NY  11050


s/ Trey R. Kelleter
Trey R. Kelleter
Vandevener Black, LLP
101 W. Main Street, Suite 500
Norfolk, VA  23510